## THE NATIONAL EXCHANGE BANK *vs.* GINN & CO.

*Banks—Payment of Check in Ignorance of Insolvency of
Drawer, Indebted to the Bank.*

If a bank pays a check drawn on it by a depositor at a time
when it has claims against him greater than his deposit and
in ignorance of the fact that the depositor had then become
insolvent and that receivers had been appointed for him, the
bank is not entitled to recover the amount of the check from
the payee on the ground that the payment was made by rea-
son of a mistake of fact. As between the holder of the check
and the bank, the transaction is closed when the payment is
made.

*Decided November 30th, 1910.*

Appeal from the Superior Court of Baltimore City (HAR-
LAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, BURKE, THOMAS, PATTISON and URNER, JJ.

*Charles G. Baldwin* (with whom was *G. Ridgely Sapping-
ton* on the brief), for the appellant.

*Edward Duffy,* for the appellee.

URNER, J., delivered the opinion of the Court.

This is an action by a bank to recover money paid on the
check of a depositor, and recovery is sought upon the ground
that the payment was made under a mistake of fact.

It appears without contradiction from the record that on
October 19, 1909, the William J. C. Dulany Company drew

its check on the National Exchange Bank of Baltimore, the appellant, payable to the order of Ginn and Company, the appellees, for the sum of five thousand dollars. The check was mailed to the appellees in New York and was by them deposited on October 20, 1909, in the National Park Bank of that city. On the same day it was forwarded by that bank to the Farmers and Merchants' National Bank of Baltimore for collection. It was received by the latter bank on the morning of October 21st, and about nine o'clock on that morning the check was passed through the Clearing House and was paid about eleven o'clock by the appellant in the regular course of its clearance settlements. At ten o'clock approximately on the same morning receivers were appointed for the Dulany Company upon a bill alleging, and its answer admitting, its insolvency. The company's deposits with the appellant just prior to the payment of the check in question amounted to $9,019.18. It was indebted to the appellant in the aggregate sum of $21,620.80, including $5,000 upon a promissory note which matured that day and $5,792.02 upon a demand note. The appellant might have set off the Dulany Company's indebtedness against its deposit credits, but supposing it to be solvent and in ignorance of the receivership, the bank honored the $5,000 check when it was presented in due course for payment. About fifteen minutes before twelve o'clock, and within an hour after it paid the check, the appellant learned for the first time of the appointment of receivers for the Dulany Company and of its insolvency. One of the officers of the appellant thereupon immediately offered to return the check to the Farmers and Merchants' Bank and requested repayment. This was refused, and the appellant then proceeded against the appellees as non-resident debtors and attached in the hands of the Farmers and Merchants' Bank as garnishee the funds which had been paid on the check.

The suit againts the appellees was tried upon issue joined on general issue pleas to the common counts in assumpsit,

including a count for money had and received, and resulted in a verdict for the defendants under the direction of the Court. There is but one exception in the record, and that refers to the action of the trial Court in thus withdrawing the case from the jury.

Upon the undisputed facts we have stated the question to be determined is whether the appellant, because of its ignorance of the drawer's insolvency at the time of the payment of the check, is entitled to recover the amount paid to the holder in order that the bank's right of set-off against the drawer may be utilized.

It is to be observed that this very interesting and important question is not here complicated by any of the elements of deception or imposition which are sometimes found in cases of erroneous payments. The conduct of every party concerned was characterized by absolute good faith. When the check was given the drawer had ample funds in the bank on which it was drawn. It was issued in the usual course of business and was used in payment of a valid claim. It was honored solely in consequence of a mistake as to the existence of a condition which, if known, would have induced a contrary course of action.

It was correctly assumed in the argument that the receivership created for the Dulany Company could not, under the circumstances, be regarded as influencing the result of this suit; because not only was the payment of the check made without knowledge of that proceeding, but it is clear that the appellant has a right of set-off which would absorb the fund if recovered. *Colton* v. *Drovers' Building Asso.,* 90 Md. 94; *Dubreuil* v. *Gaither,* 98 Md. 544.

As the suit is directly against the payee of the check, the situation is not affected by the rules of the Clearing House, through which it was presented and collected. One of these rules provides "that errors in exchange and claims arising from the return of checks or other causes are to be adjusted by eleven o'clock A. M. directly between the banks which are

parties thereto, and not through the Clearing House," and that "upon request made before eleven o'clock A. M. every bank shall extend until twelve o'clock the time for returning to it checks 'not good'." When the offer was made at about quarter to twelve o'clock to return the check under consideration it was refused upon the ground that it was made after eleven o'clock and that there had been no request prior to that hour for an extension of time. It is well settled that such a regulation is binding only upon the members of the Clearing House Association. Its rules are designed exclusively for their convenience and protection as among themselves, and have no effect upon the rights or liabilities of other parties. 5 *Cyc.* 614; *Merchants' Nat. Bank* v. *Nat. Bank of Commonwealth,* 139 Mass. 518; *Overman* v. *Hoboken City Bank,* 30 N. J. Law, 61. The failure of the appellant to offer to return the check and to demand repayment within the time prescribed by the rules of the Clearing House would therefore not impair its claim against the payee for the restoration of the fund if its right of recovery should be found to be otherwise perfect. So far as the purposes of this case are concerned, the situation is precisely the same as if the appellees had in person presented the check to the appellant and had received the money over its counter. Whether they are liable to repay it under the circumstances of the case is the sole question to be considered.

The appellant's theory is that the insolvency of the Dulany Company matured its obligations to the bank; that the deposits of the company thereupon became applicable to its indebtedness, and that consequently there was no money really available for the payment of the check when it was presented. It is argued, therefore, that the check was paid as the result of a mistake as to the true condition of the drawer's account.

In the case of *Manufacturers' Bank* v. *Swift,* 70 Md. 515, a check was paid by the bank on which it was drawn although the drawer "had no funds in the bank at the time of payment properly applicable to this purpose." The check was

originally drawn against an account opened by the drawer in his name as sole trustee by the endorsement and deposit in that form of a check payable to the order of himself and another as trustees jointly. The payment accomplished by the check given by the trustee had no relation to the trust estate to which the deposit really belonged, but the bank was misled into the contrary belief by an order of Court, which had been brought to its attention, permitting the trustee who made the deposit, on account of the absence of his co-trustee, "to act as fully, in all matters pertaining to said trust, as if both were present and acting." Under the misapprehension thus induced the acting fiduciary was allowed to add to the check given by him as sole trustee the name of his co-trustee as a drawer. The deposit account being also changed so as to stand in the name of the two trustees it was then charged with the check as corrected. The bank having been required to restore the funds thus misappropriated from the trust estate, on the ground of its actual though unintentional participation in the breach of trust (*Swift* v. *Williams*, 68 Md. 236), brought suit against the payee of the check; but recovery was denied by this Court because the bank had been neglectful of its means of knowledge and because: "It is the duty of a bank to know the state of its depositor's account and if it makes a mistake in this respect it must abide the consequences. The presentation of a check is a demand for payment; if it is paid, all the rights of the payee have been satisfied, and he is not entitled to ask any questions. It would forever destroy the character of a bank in all commerical circles if when it was ready and willing to pay a check, it permitted the holder to inquire if the drawer had funds there to meet it. It is a matter with which he has no concern. In the absence of fraud on the part of the holder, the payment of a check by a bank is regarded as a finality. And the fact that the drawer had no funds on deposit will not give the bank any remedy against the holder."

One of the decisions cited in the *Swift Case* as an author-
ity in support of the proposition we have quoted was that of
*Oddie* v. *National City Bank,* 45 N. Y. 735.    There the
check was presented for deposit to the bank on which it was
drawn and was credited to the payee's account.    This was
treated as equivalent to payment of the check by the bank,
and it was held that "where a check is presented to a bank
for deposit, drawn directly upon itself, it is the same as
though payment in any other form was demanded.    It is the
right of the bank to reject it, or to refuse to pay it, or to re-
ceive it conditionally * * * but if it accepts such a check and
pays it, either by delivering the currency, or giving the party
credit for it, the transaction is closed between the bank and
such party, provided the paper is genuine."

In a situation somewhat analogous to the present the Su-
preme Court of Michigan, speaking through JUDGE COOLEY,
said: "This case is certainly novel and peculiar.    The
drawees seek to recover from the payee the amount of a bill
which they have accepted and paid and the genuineness of
which is not disputed.    The ground upon which they plant
their right of recovery is that they have paid under a mis-
take of fact.    The mistake consisted in their security from
the drawer of the bill being fictitious, when they supposed it
to be genuine and reliable.    Admitting this to be so, how
does the fact concern the payees?    Do they assume to guar-
antee the fairness of the dealings of the drawers with the
drawees, or the adequacy of any security upon which the
dealings are based?    Not, certainly, in ordinary cases * * *
What is peculiar in the present case is that the security which
was sent forward with the bill proved to be fictitious.    It is
said that the drawees relied upon this security, and would
not have paid the bill but for a belief that it was valid.    It
is in this that the mistake consisted on which they relied for
a recovery.    If a mistake regarding their security will author-
ize the drawees to recall the payment made to the payee, no
reason is perceived why a mistake regarding the responsibil-

ity of the drawer, or regarding his honesty and integrity, or anything else upon which they relied for protection in their dealings should not justify the like action. If they suppose the drawer to be responsible when he is not, is not this as genuine a mistake of fact on their part as if they supposed a security to be good where it is fictitious?" The learned judge then proceeded to declare that "it would be an exceedingly unsafe doctrine in commercial law that one who has discounted a bill in good faith and received in its payment the strongest possible assurance that it was drawn with proper authority, should afterward hold the money subject to such a showing as the drawee might be able to make as to the influences operating upon his mind to induce him to make the payment. The beauty and value of the rules governing commercial paper consists in their perfect certainty and reliability; they would be worse than useless if the ultimate responsibility for such paper, as between payee and drawee, both acting in good faith, could be made to depend on the motives which influence the latter to honor the paper." *First National Bank of Detroit v. Burkham,* 32 Mich. 328.

The New Jersey Court of Errors and Appeals, in *National Bank of New Jersey v. Berrall,* 70 N. J. Law, 757, had under consideration a case in which the bank inadvertently paid a check drawn upon it after payment had been countermanded by the drawer and it was held that "where a bank receives in the ordinary course of business a check drawn upon it and presented by a *bona fide* holder, who is without notice of any infirmity therein, and the bank pays the amount of the check to such holder, it finally exercises its option to pay or not to pay, and the transaction is closed as between the parties to the payment."

The same rule was applied by the Virginia Supreme Court of Appeals to the payment of coupons by a bank on bonds of one of its depositors under the erroneous belief that there were funds on deposit available for that purpose. *Citizens' Bank v. Schwarzschild and Sulzberger,* 109 Va. 539.

In a note to the last mentioned case, as reported in 23 L. R. A. 1092 (N. S.), it is stated to be the "general rule that, in the absence of fraud, the payment of a check or note by a bank upon which it is drawn or at which it is payable, under the mistaken belief that the drawer of the check or the maker of the note has sufficient funds to his credit to pay it, cannot be recovered by the bank;" and numerous authorities are collected in support of this proposition.

A similar principle has been recognized by this Court in cases where payments of forged checks have been made by banks upon the supposition that they were genuine. *Commercial and Farmers' National Bank* v. *First National Bank,* 30 Md. 11; *Hardy* v. *Chesapeake Bank,* 51 Md. 562.

If, therefore, in the present case the appellant had actually set off the Dulany Company's indebtedness against its deposits, thus producing an overpayment, and had then inadvertently paid the check in question, it would clearly, under the authorities cited, have no right of action against the appellees. This is not in reality the precise condition with which we are now dealing, but we see no reason for applying to the case at bar a different rule from that which governed the cases to which we have referred. The mistake of paying the check of a drawer who has no funds to meet it is just as much due to ignorance of the real facts as is the mistake of making such payment in consequence of the erroneous assumption of the drawer's solvency. In every such instance the error results from a misconception which may have been more or less readily avoidable according to the particular circumstances. In the case of a check drawn against an insufficient deposit the bank has immediately at hand the means of learning the true state of the account, while in a case like the present, where its action is influenced by consideration of the financial responsibility of a customer, the usual sources of information may not be equally convenient. But whether the mistake relates to the condition of a drawer's deposit, as in the *Swift Case,* or as to the value of a security, as in the

Michigan decision from which we have quoted, or as to the creait of a borrower, as in the case before us, it is occasioned by misapprehension as to facts which might have been ascertained and with which a bank is presumed to have the ability to acquaint itself in the prosecution of its business. In the present instance it was not the appointment of receivers for the Dulany Company, but the insolvency which that proceeding demonstrated, that made it desirable for the appellant to apply the company's deposits to its notes instead of honoring its checks. Insolvency without a receivership would have produced the same situation. It does not appear from the record how long the company was in failing circumstances prior to the payment now sought to be revoked. But if mere ignorance of the insolvency could be held to be a sufficient ground of recovery, it would make no difference in principle for what period of time that condition had existed. If the rule contended for by the appellant were to prevail "no one," to use the language of this Court in the *Swift Case,* "could know when he could safely receive payment of a check".

There does not seem to us to be any sound or reasonable basis upon which to distinguish this case from those we have cited in the application of the rule they announce, and to require the payees of the check here involved, who were in a much less favorable position than the appellant for knowing the responsibility of the drawer, to restore the money they have received in satisfaction of a *bona fide* debt, in order that the appellant may be relieved of the necessity, to which they would then be subjected, of resorting to the insolvent estate of the debtor.

The appellant relied upon the general rule that money paid under a mistake of fact may be recovered. There are, of course, many cases in which recovery has been permitted on the ground of mistake, such as *George's Creek C. and I. Co. v. County Commissioners,* 59 Md. 255; *B. and S. Railroad Co. v. Faunce,* 6 Gill, 68; *Citizens' Bank v. Grafflin,* 31 Md. 507; *Buchanan v. Pue,* 6 Gill, 112; *Baltimore v. Lef-*

*ferman,* 4 Gill, 425 ; and other authorities cited by the appellant. In all of these the facts were quite different from those presented in cases like the one now before us, which involve exceptional considerations relating to the convenience and certainty of commercial transactions as dependent upon reliability and finality in the disposition of negotiable paper, and which accordingly constitute an exception to the general rule.

The case of *Second National Bank* v. *Western National Bank,* 51 Md. 138, was cited by the appellant as supporting its contention that such a mistake as the one here shown may be corrected. In that case the bank was permitted to cancel its certification of a note for payment where it had been so marked contrary to a written order of the maker which had been overlooked, and where no rights or liabilities had been incurred or losses sustained in consequence of the error. We do not find this case at all inconsistent with that of *Manufacturers' National Bank* v. *Swift, supra,* establishing the doctrine which must control our present decision. The cases from other jurisdictions cited by the appellant were mainly suits between members of Clearing House Associations and were largely concerned with their regulations.

The Court below, in our opinion, committed no error in directing a verdict for the defendants in accordance with their prayer, and its judgment will be affirmed.

*Judgment affirmed with costs.*